### UNITED STATES v. FALLBROOK PUBLIC UTILITY DIST. et al.
### No. 1247–SD.

United States District Court
S. D. California, S. D.
Oct. 22, 1952.

David W. Agnew, Attorney for U. S. Navy Department, Sp. Asst. to Atty. Gen., Washington, D. C., and Raymond deS. Shryock, Commander U. S. Navy, Attorney for U. S. Navy Department, Philadelphia, Pa., for plaintiff.

Swing, Scharnikow & Staniforth, Phil D. Swing, San Diego, Cal., for defendant Fallbrook Public Utility Dist.

W. B. Dennis, Fallbrook, Cal., for defendant Santa Margarita Mut. Water Co.

Edmund G. Brown, Atty. Gen. of California, Arvin B. Shaw, Jr., Asst. Atty. Gen., for defendant in intervention, People of California.

Gavin M. Craig, Sacramento, Cal., for Division of Water Resources of California.

YANKWICH, Chief Judge.

On January 25, 1951, the Government of the United States began an action to declare its rights to the water of the Santa Margarita River, which it acquired when it purchased, in 1942, certain lands from the Rancho Santa Margarita.

The complaint in the action has been fully summarized and analyzed by the writer in a previous opinion.[1]

Following pre-trial conference, a Pre-Trial Order was entered on August 25, 1952, defining the issues as they affect two of the defendants, Fallbrook Public Utilities District and Santa Margarita Mutual Water Company, public service corporations of the State of California, and the State of California, which is a defendant in intervention. We shall refer to Fallbrook Public Utilities District as "Fallbrook", and to Santa Margarita Mutual Water Company as "Santa Margarita".

The Pre-Trial Order contains the following finding:

"The Court finds that it is for the best interest of the parties hereto and for the public interest that all rights to the use of water in the Santa Margarita River system of all parties to this action be determined as against the others and the filing of cross pleadings is dispensed with as unnecessary and inconvenient. Provided that the Order setting this cause for separate trials is not affected hereby.

"The issues in this cause are hereby defined and limited in conformity with the statements contained in the Stipulation between the State of California and the United States of America, dated November 29, 1951, a copy of which is embraced in Paragraph H–1 of the attached Pre-Trial Order."

The Stipulation to which reference is made, and which was adopted by the Court, contained the following agreements:

"I

"That in Paragraphs VIII abd Ix of plaintiff's Complaint herein, and Paragraphs 2 and 3 of the Prayer of said Complaint, the word 'paramount' is used in the same sense in which that word is used in the second paragraph, on page 374 of the opinion of the Supreme Court of California in the case of Peabody v. Vallejo, 2 Cal.2d 351, fourth paragraph on page 494, of 40 P. 2d 486.

"II

"That in this cause, the United States of America claims only such rights to the use of water as it acquired when it purchased the Rancho Santa Margarita, together with any rights to the use of water which it may have gained by prescription or use, or both, since its acquisition of the Rancho Santa Margarita.

"III

"That the United States of America claims by reason of its sovereign states no right to the use of a greater quantity of water than is stated in Paragraph II, hereof.

"IV

"That the rights of the United States of America to the use of water herein are to be measured in accordance with the laws of the State of California."

With the issues thus delimited, the cause is now set for trial for October 29, 1952, as to the three named defendants. The pretrial hearings made it apparent that certain questions of law could, with great propriety, be argued and determined in advance of trial. The parties are of the view that a legal determination of these questions might be a guide to counsel in the presentation of the case and reduce the trial time materially.

---

1. United States v. Fallbrook Public Utility District, D.C.Cal.1951, 101 F.Supp. 298.

These questions, propounded by the respective counsel and approved by the court, have been briefed, and the object of this opinion is to state the Court's conclusions upon them.

The following facts bearing on the legal questions involved need be adverted to.

Fee simple title resides in the United States of America to 135,000 acres of land, which is situated largely in San Diego County, California.

The lands were acquired by the United States of America in the year 1942.

Lands riparian to the Santa Margarita River are owned in fee simple by the United States of America and comprise part of the military establishment in question.

Lands riparian to the Santa Margarita River are owned by the defendant Vail Estate.

By a stipulated judgment, Exhibit A of the Complaint, the respective rights in the Santa Margarita River of the United States of America and the Vail Estate, insofar as this litigation is concerned, have been established.

It is contended by the United States that approximately 38,000 acres of the 135,000 acres owned by the United States of America, are riparian to the stream in question. Of that total riparian acreage, approximately 18,700 acres, it is contended, are susceptible of practicable and profitable irrigation. At variance with that figure is the assertion by the defendants that less than 12,000 acres of the lands of the United States within the watershed of the Santa Margarita River are susceptible of practical irrigation.

Fallbrook has been a public utility district since 1922, and has engaged in supplying irrigation and domestic water to the lands within its boundaries and to the people living thereon.

It has installed in the channel of the Santa Margarita River a dam impounding water to which the United States claims to be entitled. It has also installed a pump in the channel of that stream. With that pump the defendant Fallbrook is now, and has been for the past two years, pumping and extracting approximately 1,800 acre-feet of water from the Santa Margarita River to which the United States claims to be entitled.

The diversion by Fallbrook is made pursuant to Permit No. 7033, issued by the Department of Public Works, Division of Water Resources, State Engineer, State of California.

Fallbrook, pursuant to Permit No. 8511, issued by the Department of Public Works, Division of Water Resources, State Engineer, State of California, asserts a right to construct a dam on the Santa Margarita River with a capacity of 32,000 acre-feet, and to divert from the Santa Margarita River 10,000 acre-feet of water annually.

On October 4, 1946, there was filed an application with the State of California Department of Public Works, Division of Water Resources, on behalf of Santa Margarita.

Pursuant to this application, Santa Margarita claims to have the right to divert not to exceed 60 cubic feet per second from the stream flow of the Santa Margarita River and its tributaries, and to store 5,000 acre-feet of the waters of the Santa Margarita River under and pursuant to any permit which may hereafter be issued by the State of California pursuant to the application mentioned. On the 12th day of November, 1947, Santa Margarita filed its application with the Division of Water Resources of the State of California for permission to store 60,000 acre-feet of the waters of the Santa Margarita River under and pursuant to any permit which may be issued by said Division of Water Resources.

On the 30th day of June, 1948, the plaintiff, the United States of America, filed its application with the Division of Water Resources of the State of California, wherein the plaintiff requested the issuance of a permit authorizing it to store 165,000 feet of water of the Santa Margarita River. All said applications are still pending before the Division of Water Resources. And no diversion of water has been made by Santa Margarita.

I

Riparian Rights and Appropriation

So far as the defendants Fallbrook and Santa Margarita are concerned, the issue

turns upon the familiar one which has always characterized water litigation in California,—that is, the rights of riparian owners against appropriators. The State of California is interested merely in seeing that the integrity of its law be respected.

In the prior opinion, the history of the development of riparian rights in California and their modification by constitutional revision was gone into.[2] We need not review that history. But it is well to begin this discussion by referring to the constitutional amendment of November 6, 1928, which limits the rights of both riparian owners and appropriators of water in California to beneficial use.[3]

The Water Code, which carried into effect this constitutional provision, reasserts the principle that it is the policy of the State to insure the fullest beneficial use of its water resources.[4] The rights of riparian owners are recognized in both the constitutional amendment and in the Code. But the amendment limits them to so much of the flow of a stream as may be

> "required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses".[5]

The Water Code redefines the right in identical language.[6] It also declares all water within the State to be

> "the property of the people of the State,"

subject to the right to use of water by appropriation, and with full recognition of riparian rights.[7]

The Supreme Court of California has stated that the object of the Water Commission Act, later codified in the Water Code, was

"to provide an orderly method for the appropriation of the unappropriated waters of the state and, to that end, a state water commission was created and was vested with certain powers. We find nothing in the act which purported to enlarge the rights of riparian owners as such or to curtail the rights of appropriators. On the contrary, the language employed in the act shows an intention to declare the waters of the state to be subject to appropriation in so far as that can be done without interfering with vested rights. As we read the exception found in the above-quoted portion of section 11 of the act, in the light of all other provisions of this act, it constitutes no more than an affirmation of the existing rights of riparian owners in and to the natural flow and it may not be construed as enlarging the rights of riparian owners so as to give them in effect riparian rights in foreign water as well as in the natural flow." [8]

In this respect, the right does not rise above the limitation imposed by the constitutional amendment of 1928. The Supreme Court of California has said:

> "Under this provision, whenever water in a natural stream or watercourse * * * is not reasonably required for beneficial use by the owners of paramount rights, whether the water is foreign or part of the natural flow, such owners cannot prevent use of the waters by other persons, and the water must be regarded as surplus water subject to appropriation by those who can beneficially use it." [9]

The water rights of a riparian owner stem from his ownership of the land

---

2. United States v. Fallbrook Public Utility District, supra, 101 F.Supp. at pages 302–305.

3. Constitution of California, Art. XIV, Sec. 3.

4. California Water Code, Sec. 100.

5. Constitution of California, Art. XIV, Sec. 3.

6. California Water Code, Sec. 101.

7. California Water Code, Sec. 102.

8. Bloss v. Rahilly, 1940, 16 Cal.2d 70, 75–76, 104 P.2d 1049, 1051.

9. Stevinson Water District v. Roduner, 1950, 36 Cal.2d 264, 270, 223 P.2d 209, 212. "If, * * * defendants do not have sufficient water for domestic and irrigation purposes, there is open to them the same right which any other nonriparian owner has to make application to the Division of Water Resources for a permit to appropriate water, and if

and are appurtenant to it. The right of an appropriator depends upon the actual taking of the water. And, in California law, the term is used

> "to refer to any taking of water for other than riparian or overlying uses." [10]

Other than the limitation to place the water to beneficial use, the right of the riparian owner is limited by the rights of other riparian owners. As to this, the Supreme Court of California has said:

> "A riparian owner has no right to any mathematical or specific amount of the water of a stream as against other like owners. He has only a right in common with the owners to take a proportional share from the stream—a correlative right which he shares reciprocally with the other riparian owners. No mathematical rule has been formulated to determine such a right, for what is a reasonable amount varies not only with the circumstance of each case

but also varies from year to year and season to season." [11]

## II
### Beneficial Use, Present and Prospective

█ In impressing the limitation of beneficial use on riparian water rights, California law does not limit the owner to present use. To the contrary, giving, in this respect, effect to the constitutional enactment, it envisages uses to which lands may not be put at the time, but to which they may be made "adaptable".[12]

The California Supreme Court, in applying this section, has stressed the prospective reasonable beneficial uses which the law has in mind. In one of the first leading cases involving the interpretation of the new constitutional amendment, the Court said:

> "The new doctrine not only protects the actual reasonable beneficial uses of the riparian but also the prospective reasonable beneficial uses of the ripar-

that State agency finds that water is available, a permit may be granted. Bloss v. Rahilly, 16 Cal.2d 70, 104 P.2d 1049. Of course, before the plaintiff could invoke the power of a court of equity to restrain the diversion of water above its lands, it would be necessary for it to show first, that *there was a wrongful diversion of water above its lands*, and second, *that the amount wrongfully diverted would be rightfully used by plaintiff and that the water is being used or would be used for reasonable and beneficial purposes.*" Carlsbad Mutual Water Co. v. San Luis Rey Development Co., 1947, 78 Cal.App.2d 900, 914, 178 P.2d 844, 853. (Emphasis added.)

10. City of Pasadena v. City of Alhambra, 1949, 33 Cal.2d 908, 925, 207 P.2d 17, 28.

11. Prather v. Hoberg, 1944, 24 Cal.2d 549, 560, 150 P.2d 405, 411. This is but a recent reiteration of what the courts of California have said before:
 "The rights of riparian proprietors on the same stream, with respect to each other, *are mutual and reciprocal.* Neither has a right to the whole stream as against the rights of the others. Each is entitled only to his reasonable share thereof, considering the rights and needs of the others, and such rights must be exercised and the use must be made

only on the parcel to which the rights attach." Parker v. Swett, 1922, 188 Cal. 474, 475, 205 P. 1065, 1069. (Emphasis added.)
In a later case, City of Pasadena v. City of Alhambra, supra, the same principle is expressed and contrasted with the lack of such correlation as to appropriators:
 "As between overlying owners, *the rights, like those of riparians, are correlative and are referred to as belonging to all in common;* each may use only his reasonable share when water is insufficient to meet the needs of all. Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236, 99 Am.St.Rep. 35; see 26 Cal.Jur. 269–273, 276; cf. 25 Cal.Jur. 1063–1067. As between appropriators, however, *the one first in time is the first in right, and a prior appropriator is entitled to all the water he needs, up to the amount that he has taken in the past, before a subsequent appropriator may take any.*" City of Pasadena v. City of Alhambra, supra, 33 Cal. 2d at page 926, 207 P.2d at page 29.

12. Constitution of California, Art. XIV, Sec. 3. And see, Porters Bar Dredging Co. v. Beaudry, 1911, 15 Cal.App. 751, 764, 115 P. 951; Carlsbad Mutual Water Co. v. San Luis Rey Development Co., 1947, 78 Cal.App.2d 900, 911–912, 178 P.2d 844.

ian. *As to such future or prospective reasonable beneficial uses, it is quite obvious that the quantity of water so required for such uses cannot be fixed in amount until the need for such use arises. Therefore, as to such uses, the trial court in its findings and judgment, should declare such prospective uses paramount to any right of the appropriator.*

"By such declaratory judgment, the rights of the riparian will be fully protected against the appropriative use ripening into a right by prescription, but, until the riparian needs the water, the appropriator may use it, thus, at all times, putting all of the available water to beneficial uses." (Emphasis added.)[13]

This feature has been reasserted in later cases.[14] Indeed, these and other cases declare it to be the function of courts, whenever an action is instituted for the determination of water rights, to ascertain the preferential and paramount rights of the riparian owner and to enjoin the assertion of an adverse use which might mature into a prescriptive right.[15]

## III

### Nature of Beneficial Use

Ever since the recognition of riparian rights in California, the courts have laid down very broad rules relating to what con-

stitutes beneficial use. Among those which have received recognition are household and domestic needs,[16] irrigation and other agricultural needs,[17] power for mills and factories,[18] and for mining.[19] The early and the leading cases adopt a realistic attitude by holding that many uses which might not have been recognized at common law are proper beneficial uses at the present time.[20] In this respect, the concept has been broadening as the need to have water for diversified uses has gained recognition.[21] While these cases hold that seasonal storage of water is not permitted, they recognize that where, in the development of land and the use of power to carry on the various beneficial activities, it is necessary to store water temporarily, either in its own or in other channels, such incidental storage is permissible.

Illustrative of the realistic approach is a recent case in which the use of riparian water for the purpose of furnishing water to guests at a resort was held within the scope of domestic use. The Court used very broad and significant language:

"Without question the authorities approve the use of water for domestic purposes as first entitled to preference. That use includes consumption for the sustenance of human beings, for household conveniences, and for the care of livestock. *The fact that human beings are occupants of hotels,*

13. Tulare Irrigation District v. Lindsay-Strathmore Irrigation District, 1935, 3 Cal.2d 489, 525, 45 P.2d 972, 986.

14. Meridian, Ltd. v. City and County of San Francisco, 1939, 13 Cal.2d 424, 445, 90 P.2d 537, 91 P.2d 105.

15. City of San Bernardino v. Riverside, 1921, 186 Cal. 7, 19–20, 198 P. 784; Peabody v. City of Vallejo, 1935, 2 Cal.2d 351, 374, 40 P.2d 486.

16. Half Moon Bay Land Co. v. Cowell, 1916, 173 Cal. 543, 550, 160 P. 675.

17. Holmes v. Nay, 1921, 186 Cal. 231, 199 P. 325; Antioch v. Williams Irrigation District, 1922, 188 Cal. 451, 467–468, 205 P. 688. The Water Code declares: "It is hereby declared to be the established policy of this State that the use of water for domestic purposes is the highest use of water and that the

next highest use is for irrigation." California Water Code, Sec. 106.

18. Mentone Irrigation Co. v. Redlands etc. Co., 1909, 155 Cal. 323, 100 P. 1082, 22 L.R.A.,N.S., 382; Fall River Valley Irrigation District v. Mt. Shasta Power Corp., 1927, 202 Cal. 56, 69–70, 259 P. 444, 56 A.L.R. 264; Seneca Consolidated Gold Mines Co. v. Great Western Power Co., 1930, 209 Cal. 206, 215–216, 287 P. 93, 70 A.L.R. 210; Colorado Power Co. v. Pacific Gas & Electric Co., 1933, 218 Cal. 559, 565, 24 P.2d 495.

19. Bear River & A. Water & Mining Co. v. New York Mining Co., 1857, 8 Cal. 327, 332–333.

20. Mentone Irrigation District v. Redlands, 1909, 155 Cal. 323, 327–328, 100 P. 1082, 22 L.R.A.,N.S., 382.

21. Moore v. California Oregon Power Co., 1943, 22 Cal.2d 725, 730, 140 P.2d 798.

*apartment houses,* \* \* \* *auto camps, or resorts such as those conducted by the parties to this action does not necessarily exclude them from the preferential class.* Frederick v. Bognor Water Co., 78 L.J.Ch. 40; 21 Mews' Digest of English Case Law, p. 738. But it may well be that the commercial character of the proprietor's business in serving his guests may be so extensive that *a lower riparian* whose domestic use, whether or not commercialized, would be prejudiced by the business activities of the upper riparian and to such an extent as to require the interposition of a court of equity to safeguard his rights. This would especially be true where swimming pools, ornamental pools, boating, and the like are furnished as a part of the service to the guests (see Wiel, supra, pp. 803–807), which uses, in themselves, have been held to be not domestic. Bernard Castle Urban Council v. Wilson, 71 L.J.Ch. 825, 21 Mews' Digest of English Case Law, p. 742. *The question is whether under all the circumstances of the case the use of water by the one is reasonable and consistent with the corresponding enjoyment of the right by the other.* Dumont v. Kellogg, 1874, 29 Mich. 420, 18 Am.Rep. 102. *What constitutes reasonable use is, in the first instance, a question for the trier of facts.*"[22] (Emphasis added.)

This portion of the opinion is more or less expository. It is not our intention to draw definite conclusions until we reach the end. However, while professing that

22. Prather v. Hoberg, 1944, 24 Cal.2d 549, 562, 150 P.2d 405, 412. Cases such as Katz v. Walkinshaw, 1903, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236; Barton v. Riverside, 1909, 155 Cal. 509, 101 P. 790, 23 L.R.A.,N.S., 331; City of San Bernardino v. Riverside, 1921, 186 Cal. 7, 198 P. 784; Antioch v. Williams Irrigation District, 1922, 188 Cal. 451, 205 P. 688; Eden Township Water District v. City of Hayward, 1933, 218 Cal. 634, 24 P.2d 492; City of Lodi v. East Bay Municipal Utility District, 1936, 7 Cal.2d 316, 60 P.2d 439; City of Pasadena v. City of Alhambra, 1949, 33 Cal. 2d 908, 207 P.2d 17; and others which hold that the use of the water of a stream to supply the inhabitants of a municipality with water for domestic purposes is not a riparian right, do not help. The military establishment conducted by the Government is not a municipality, even though it may have a population comparable to that of some municipalities. The use to which it is being put is more akin to that of an owner of a large piece of property who establishes habitations, hotels or resorts, and uses the water to supply the needs of the guests,—as was the case in Prather v. Hoberg, supra. The latter case modified the doctrine declared by the Supreme Court in Cowell v. Armstrong, 1930, 210 Cal. 218, 225, 290 P. 1036, and which seemed to adopt the distinction established by the English cases, especially by Attorney General v. Great Eastern Ry. Co., 23 L.T.(N.S.) 344, affirmed in L.R., 6 Ch. 572,—and by some text writers between natural and artificial uses in the law of riparian rights. Counsel for Fallbrook not only would adopt the bare distinction to which the California courts alluded, but would make the entire law of the English case the law of California. They cite extensively from the opinions of the various Justices which indicate a narrow limitation of beneficial use to the common law concept. The trend in modern water law is away from such strict definition. The water needs of an arid state like California have become so diversified that it would be tragic to confine the use of riparian water to the restricted limits of English common law. It was bad enough for California to adopt the doctrine of riparian rights, so unsuited to the desert country. It would be catastrophic if, today, after the modification introduced into the doctrine of riparian rights not only by the California constitutional amendment of 1928, but also by the changed attitude of our higher courts, we were to engraft upon the California law of riparian rights the rigid limitations of the common law as to use. This, evidently, explains why the Supreme Court,—speaking through Mr. Justice Shenk, who, perhaps, more than any other living member of that court, is responsible for the more modern approach to the problem of water rights,—while referring to the distinction between natural and commercial use, sanctioned a commercial use which would not have the approval of the English court in the case referred to. So Prather v. Hoberg, supra, stands as a modification of the rigid distinction be-

"the interest of the People of the State of California in this proceeding is primarily to preserve and protect the integrity of State water law",

the brief filed by the State of California joins the corporate defendants in insisting, with much emphasis, that the use of water for military purposes is not a riparian use.

Surprisingly, the State of California, in all seriousness, would limit the right of the Government to the stationing of a few soldiers to guard the stream and to supplying them with water. Indeed, the State's brief uses a term which seems to have been coined for the occasion, "urban service",— as representing the type of service which the Government has established and which the State insists should be supplied in another manner. We quote from the brief:

"Obviously, the stationing of a few soldiers as sentries on the Rancho Santa Margarita, and their being supplied with water from the stream for domestic purposes, would not raise any serious question of reasonableness. On the other hand, when the United States brings on the Ranch many thousand, (50,000 or more) of men, and further sets up housing developments for the families of officers and noncommissioned personnel, and for civilian employees, the resulting effect is that of an urbanized municipal water service. Urban service of this extended character, which under our law has always been carried on under appropriations, not under riparian claims, is so exaggerated, that the question whether it can be deemed reasonable must be given serious consideration."

While the courts have held that furnishing water by a municipality to its inhabitants is not a riparian use, we know of no California case which has *limited the number of beings who can be supplied with domestic water per acre of ground.* We believe that a military population of 50,000 on 130,000 acres of ground would not be con-

sidered "urban" concentration. We know of no rule which states that "urban" concentration must be supplied through appropriation when riparian waters are available. To the contrary, the cases heretofore referred to do not exclude a military use of the type under consideration.

For, if a riparian owner may develop power for use on his riparian lands or transport the power elsewhere, if he may operate a mill or mining establishment, if he may use the water to satisfy cattle and humans and may use water to satisfy the needs of paying guests in hotels located on the premises, certainly the United States Government could house soldiers on a huge ranch which it purchased, and use the water for the purpose of training and housing of military and allied personnel, and for conducting hospital facilities, and also carry on, either directly or indirectly, such incidental, temporary agricultural activities as it does, and of the type which admittedly is being conducted by the Government at Camp Pendleton.

California has many military establishments. We are quite certain that if the interpretation of the defendants concurred in by the State were adopted, and the Government were to announce that it intends to abandon Camp Pendleton, many persons would protest the removal from the State of the economic value of 50,000 soldiers and the purchasing power which their maintenance entails. California is one of the states which sanctions what is known as "exploitation funds",—money raised by taxation by counties, which is turned over to various groups, such as the Chamber of Commerce, All-Year Clubs and similar organizations, with the idea of exploiting the availability of California for the establishment of industry and other facilities.

California has competed in the Congress with other states to secure such military establishments. If it had been known that California would insist that a military use of waters is not riparian, I am quite cer-

---

tween natural and artificial uses which earlier cases may have sanctioned. The application of its rationale to the facts in this case so as to include military use

as a beneficial use is commanded not only by the language which the Court used, but also by the new approach which the case represents.

tain that the Congress and the military authorities who have brought to California so many military establishments, might have hesitated to purchase land for military establishments elsewhere than in incorporated areas having an assured water supply. The State's contention is surprising in view of California's efforts, made over the course of years, and continued to date, to increase its population, and the constant endeavor to diversify the types of establishments which it attracts. Of course, the State is free to join the corporate defendants in making such assertions. But to us, it seems a departure from the impartiality which the State claims in this litigation.

█ What precedes expresses our conclusion that, while the question of reasonableness of the particular use is a question of fact, the contention that a military use is not *per se a reasonable riparian use, must be rejected.*

### IV

### Prescriptive Rights

██ Ever since the inception of water law in California, the Courts have held that because water is a species of property, title by prescription could be acquired by adverse use for the five-year period prescribed by the California Code for acquiring title by adverse possession.[23] There has been no deviation from this principle. Whether the courts are dealing with right to surface or underground water, or whether they are dealing with assertions between appropriators and riparian owners, or one or the other,[24] all that is required is that the ordinary elements of adverse possession be present,—i. e., (1) actual use, (2) open and notorious, (3) hostile and adverse to the original owner's title, (4) continuous and uninterrupted use for a statutory period, and (5) a claim of title.[25]

█ The most important element is that the taking of water invade the rights of another. For this reason, a right to use water acquired by permission or license from another can never ripen into a title.[26] But if the inception of the right be adverse, it may ripen into prescriptive title so far as a riparian owner is concerned,

23. California Code of Civil Procedure, Sec. 318; California Civil Code, Sec. 1007; Yankee Jim's Union Water Co. v. Crary, 1864, 25 Cal. 504, 509.

24. Katz v. Walkinshaw, 1903, 141 Cal. 116, 135, 70 P. 663, 74 P. 766, 64 L.R.A. 236; California Pastoral & Agricultural Co. v. Madera, etc., Irr. Co., 1914, 167 Cal. 78, 85–86, 138 P. 718; Northern California Power Co. v. Flood, 1921, 186 Cal. 301, 304, 199 P. 315; Pabst v. Finmand, 1922, 190 Cal. 124, 211 P. 11; Lee v. Pacific Gas & Electric Co., 1936, 7 Cal.2d 114, 120, 59 P.2d 1005; Albaugh v. Mt. Shasta Power Corp., 1937, 9 Cal.2d 751, 765–766, 73 P.2d 217; Moore v. California Oregon Power Co., 1943, 22 Cal.2d 725, 735, 140 P.2d 798; Carlsbad Mutual Water Co. v. San Luis Rey Development Co., 1947, 78 Cal.App.2d 900, 913, 178 P.2d 844; Locke v. Yorba Irrigation Co., 1950, 35 Cal.2d 205, 211, 217 P.2d 425; City of Pasadena v. City of Alhambra, 1949, 33 Cal.2d 908, 926–927, 207 P.2d 17. Prescriptive rights are rights of property in California. What the owner loses by limitation, the adverse possessor acquires by prescription. California Civil Code, Sec. 1007. Montecito Valley Water Co. v. Santa Barbara, 1904, 144 Cal. 578, 593, 77 P. 1113; Pabst v. Finmand, 1922, 190 Cal. 124, 128–129, 211 P. 11; City of San Diego v. Cuyamaca Water Co., 1930, 209 Cal. 105, 132–134, 287 P. 475. Prescriptive rights to water or any property are extra-legal. *And I am of the view that neither the Water Commission Act of 1913,* Cal.Stats.1913, Ch. 586, Cal.Water Code, Secs. 1000–4360, *nor the constitutional amendment of 1928, could, or did affect the prescriptive rights to water and the manner of their acquisition.* See Note, Waterlaw: Mutually Prescriptive Interest in Underground Water, 1949, 37 Cal.Law Rev. 713; Edward F. Treadwell, Developing a New Philosophy of Water Rights, 1950, 38 Cal.Law Rev. 572, 579–580; Russell R. Kletzing, Prescriptive Water Rights in California, 1951, 39 Cal.Law Rev. 369; Delger Trowbridge, Prescriptive Water Rights in California: An Addendum, 1951, 39 Cal.Law Rev. 525.

25. Crain v. Hoefling, 1942, 56 Cal.App.2d 396, 401–402, 132 P.2d 882; Fryer v. Fryer, 1944, 63 Cal.App.2d 343, 346–347, 147 P.2d 76; Peck v. Howard, 1946, 73 Cal.App.2d 308, 325–326, 167 P.2d 753.

26. Thomas v. England, 1886, 71 Cal. 456, 458–460, 12 P. 491; Abbott v. Pond, 1904, 142 Cal. 393, 397–398, 76 P. 60; Fryer v. Fryer, supra, 63 Cal.App.2d 346, 147

whether it relates to the quantity of water or the non-riparian use.[27]

The bearing of these principles upon the facts, as they are disclosed by the pleadings and the pre-trial order, is this:

■ 1. Granting that the Government and its predecessor in interest may have put the water to non-riparian use, whether by using it in other watersheds or not, the Government will have the right to establish that they and their predecessors have acquired a prescriptive right to such use.

■ 2. Under the same principles, Fallbrook cannot assert any prescriptive rights during the period when it received water under a revocable license received on July 20, 1932, from the predecessor in interest of the United States, which was revoked by the United States on July 31, 1948, and pursuant to which Fallbrook was permitted to divert, for domestic use only, ten miners inches of water (⅕ of a cubic foot of water per second of time).

### V

### Appropriation

Santa Margarita is not a riparian owner. Fallbrook claims only ownership of a possible 400 acres as riparian. Fallbrook has used some of the water which it secured under a revocable license of the United States Government for distribution among its patrons for domestic and agricultural purposes. Its first appropriation under the law of California is dated October 11, 1946. The first application for appropriation by Santa Margarita was October 4, 1946.

■ The Supreme Court of California has found that the normal flow of water in the Santa Margarita River is insufficient to satisfy the needs of the riparian owners.[28] Leaving aside, for the moment, the question whether this judgment is binding as to persons who are not parties to it, we are confronted with the fact that as of the date of the decision, July 12, 1938, there is a finding that at normal flow, the Santa Margarita River does not have enough water to satisfy the needs of riparian owners. This being so, and assuming that Fallbrook and Santa Margarita may appropriate surplus waters under the laws of the State of California, which are not being put to beneficial use by the riparian owners,[29] the burden is on Fallbrook and Santa Margarita to prove the existence of such surplus.[30] This principle applies whether the dispute is between two appropriators,[31] or between an appropriator and a riparian owner who seeks the unused surplus of a riparian owner.[32]

■ This rule *does not*, however, relieve the riparian owner of proving the amount of water required for beneficial use. Both facets of this problem have been succinctly stated by the Supreme Court of California:

"This rule, placing the burden on the appropriator who seeks to take water from a particular water field to show that there is a surplus, does not relieve the riparians and appropriators, who are already in the field, from the burden of proving the quantity of water that they have been using, and that such amount is necessary for their reasonable beneficial purposes. The rule

P.2d 76. This is also the general rule elsewhere. 56 Am.Jur., Waters, Secs. 328–329.

27. Duckworth v. Watsonville, etc., Co., 1907, 150 Cal. 520, 531, 89 P. 338; Logan v. Guichard, 1911, 159 Cal. 592, 597, 114 P. 989; Albaugh v. Mt. Shasta Power Corp., supra, 9 Cal.2d 765–766, 73 P.2d 217; Larsen v. Apollonio, 1936, 5 Cal.2d 440, 55 P.2d 196.

28. Rancho Santa Margarita v. Vail, 1938, 11 Cal.2d 501, 516–517, 81 P.2d 533.

29. California Water Code, Secs. 1201, 1240.

30. City of Lodi v. East Bay Utility Dist. 1936, 7 Cal.2d 316, 339, 60 P.2d 439; Allen v. California Water & Tel. Co., 1946, 29 Cal.2d 466, 481, 176 P.2d 8.

31. Lodi v. East Bay Utility Dist. supra, 7 Cal.2d 339, 60 P.2d 439; Peabody v. City of Vallejo, 1935, 2 Cal.2d 351, 381, 40 P.2d 486; Tulare Irr. Dist. v. Lindsay-Strathmore Dist., 1935, 3 Cal.2d 489, 535, 45 P.2d 972.

32. Allen v. California Water & Tel. Co., 1946, 29 Cal.2d 466, 481, 176 P.2d 8.

throws on the new appropriator the burden of proving the existence of a surplus from which it can extract the quantity it desires from either the surface or subterranean flow without injury to the uses and requirements of those who have prior rights. In the present case, while it is true the burden was on appellant to prove the existence of a surplus, that burden did not come into existence until after the respondent riparians first proved the amount required by them for reasonable beneficial purposes."[33]

## VI

### The Rights of Lower Riparian Owners

■ All three defendants argue the proposition that a lower riparian owner cannot, *ordinarily,* acquire any adverse rights to the same stream against an upper owner.

Admittedly, this is a correct general statement of the law of California, although there have been deviations in the cases.[34] The Supreme Court of California has stated the principle, the reasons behind it, and the conditions which control its application in this language:

"A right can be gained by prescription only by acts which operate as an invasion of the rights of the person against whom the right is sought and which afford a ground of action by such party against such claimant, and it is a rule of law so well settled by decisions in this and other states as to scarcely need any citation to support it that *a lower use, since it interferes in no way with the flow above, constitutes no invasion of the upper riparian owner's right, and cannot, therefore,*

*afford any basis for a prescriptive right. * * * In the absence of a showing that the upper owner is using the water under a claim of prescriptive right, the lower owner has the right to presume that such owner is only taking that to which he is entitled as a riparian owner by virtue of his riparian right.* Skelly v. Cowell, 37 Cal.App. 215, 173 P. 609; Oliver v. Robnett [190 Cal. 51] 210 P. 408. *Such use was not hostile unless there was an actual clash between the rights of the respective owners.* While there was sufficient water flowing down the stream to supply the wants of all parties, its use by one was not an invasion of the rights of the other." [35] (Emphasis added.)

It is to be noted that the inference that, ordinarily, the use of the upper riparian owner is not hostile is based *upon the assumption* that there was an adequate supply of water for all. This may be overcome by a showing that there was an adverse use, (a) either because of insufficiency of the water flow, or (2) for other reasons showing hostile use. If there is water enough for all, under the doctrine of correlation, the benefit goes to the lower riparian owners. The appropriator cannot benefit by the situation unless, after the correlative needs of all riparian owners have been satisfied, there is a surplus capable of appropriation.

So, here, again, the rights of the two corporate defendants depend upon the existence of a surplus as to which their right of appropriation could attach.

## VII

### Control, Federal or State

In view of what precedes, the question of control by the United States within the

33. Tulare Irr. Dist. v. Lindsay-Strathmore Dist., supra, 3 Cal.2d 535, 45 P.2d 991.

34. Half Moon Bay Land Co. v. Cowell, 1916, 173 Cal. 543, 549–550, 160 P. 675; Holmes v. Nay, 1921, 186 Cal. 231, 234, 199 P. 325; Pyramid Land & Stock Co. v. Scott, 1921, 51 Cal.App. 634, 637, 197 P. 398; Williams v. Costa, 1921, 52 Cal. App. 396, 403–404, 198 P. 1017; Cory v. Smith, 1929, 206 Cal. 508, 511, 274 P. 969. For a deviation from this principle, see, Larsen v. Apollonio, 1936, 5 Cal.2d 440, 55 P.2d 196.

35. Pabst v. Finmand, 1922, 190 Cal. 124, 128–129, 211 P. 11, 12; but see, Oliver v. Robnett, 1922, 190 Cal. 51, 55, 210 P. 408, 410, in which it is stated: "The use of water by an upper riparian owner is adverse to the rights of the lower riparian owner only when it constitutes such an interference with the rights of the lower owner as would justify an action to restrain such interference."

boundary of the ranch which it acquired by purchase and on which it is conducting a military establishment, does not seem of great importance. For if, as we hold, the use of water for a military reservation is a beneficial use, then the question of such use in correlation with the other riparian uses [36] does not concern these defendants.

As to the other large riparian user,—the Vail interest,—the matter is covered by a stipulation which makes the stipulated judgment in the case between the Vails and the Government's predecessor the measure of their rights. Even the right to impound water temporarily [37] as between the Government and the other chief riparian owner is governed by the same stipulation.

This stipulation recognizes, as do the cases just cited, the right to store water temporarily with a view of putting the water to better use for whatever operations may be conducted by the Government. The Government concedes that it gives full recognition to the rights of other riparian owners. Indeed, its brief states:

"Under this heading let it be emphasized that the United States of America does not claim any greater rights than those to which it succeeded from the Rancho Santa Margarita plus such other rights as may have accrued by use or prescription. It does assert, however, that in the administration of those rights to the use of water—fully recognizing the rights of other riparians and other claimants and avoiding encroachment upon those rights—that the State Engineer of the State of California does not have jurisdiction within the boundaries of the military establishment in question."

What the Government is contesting is the possible contention that the cession of exclusive jurisdiction by the State of California to the United States Government over these and kindred lands acquired by it does not extend to land *not used* for military purposes. It is accepted law that any act of cession by a state gives the United States exclusive jurisdiction regardless of the use to which a portion of the land might be put. The contention to the contrary is answered in the very succinct language of Mr. Justice Brewer:

"It is contended by appellant's counsel that, within the scope of those decisions, jurisdiction passed to the general government only over such portions of the reserve as are actually used for military purposes, and that the particular part of the reserve on which the crime charged was committed was used solely for farming purposes. But in matters of that kind the courts follow the action of the political department of the government. *The entire tract had been legally reserved for military purposes.* United States v. Stone, 2 Wall. 525, 537. *The character and purposes of its occupation having been officially and legally established by that branch of the government which has control over such matters, it is not open to the courts, on a question of jurisdiction, to inquire what may be the actual uses to which any portion of the reserve is temporarily put."*[38] (Emphasis added.)

This carries into effect the constitutional mandate which gives the Congress the power to "exercise exclusive Legislation" over such lands within a State as may

"by Cession of particular states, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings; * * *."[39]

36. Carlsbad Mutual Water Co. v. San Luis Rey Development Co., 1947, 78 Cal.App. 2d 900, 911, 178 P.2d 844.

37. Seneca Consolidated Gold Mines Co. v. Great Western Power Co., 1930, 209 Cal. 206, 215–217, 287 P. 93, 70 A.L.R. 210;

Moore v. Cal. Oregon Power Co., 1943, 22 Cal.2d 725, 731–732, 140 P.2d 798.

38. Benson v. United States, 1892, 146 U. S. 325, 331, 13 S.Ct. 60, 62, 36 L.Ed. 991.

39. United States Constitution, Article 1, Sec. 8, Cl. 17.

Writing for a unanimous court, half a century after Mr. Justice Brewer used the language just quoted, Mr. Justice Black asserted the, need for exclusive legislative power as of the essence of sovereignty:

"The realty of petitioner had been conveyed to and used by the United States for the essential governmental activities which authorized the exercise of its exclusive legislative jurisdiction. *Exclusive legislative power is in essence complete sovereignty.*" [40] (Emphasis added.)

There has been no deviation from this principle either in cases which preceded or those which followed the cases just cited.[41]

The only exception exists in those instances wherein, either by general law, or by a special cession statute, certain laws are allowed to coexist with the federal law,

—there being no inconsistency between the two.[42]

The variety of cases in which these principles have been applied, ranging from attempts to tax persons within government reservations, or to collect taxes on goods, down to the fencing of a railroad right-of-way, which ran through a military enclave,[43] attest to the rigor with which the courts, except in cases where rights were specifically reserved, have sustained the norm that the acquisition of land by the Government for military purposes with the consent, expressed or implied, of a State, gives the Government *exclusive* jurisdiction, whether the land is used for the purpose of the acquisition or not.

Granted that, in certain instances, federal and state legislation might be exercised without conflict, it is inconceivable that,

**40.** S.R.A., Inc., v. Minnesota, 1946, 327 U. S. 558, 562, 66 S.Ct. 749, 752, 90 L.Ed. 851. Mr. Justice Story was as explicit in 1819. See United States v. Cornell, 1819, 25 Fed.Cas.Nos. 14,867, 14,868, pp. 646, 647, 650, 651, wherein he said:
"The constitution of the United States declares that congress shall have power to exercise 'exclusive legislation' in all 'cases whatsoever' over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards and other needful buildings. When therefore a purchase **of** land for any of these purposes is made by the national government, and the state legislature has given its consent to the purchase, the land so purchased by the very terms of the constitution ipso facto falls within the exclusive legislation of congress, *and the state jurisdiction is completely ousted. This is the necessary result, for exclusive jurisdiction is the attendant upon exclusive legislation; and the consent of the state legislature is by the very terms of the constitution, by which all the states are bound, and to which all are parties, a virtual surrender and cession of its sovereignty over the place.*" 25 Fed.Cas. p. 648. (Emphasis added.)

**41.** Fort Leavenworth R. R. Co. v. Lowe, 1885, 114 U.S. 525, 532, 5 S.Ct. 995, 999, 29 L.Ed. 264, where the principle is summed up in this pithy sentence: "*When the title is acquired by purchase by consent of the legislatures of the states, the federal jurisdiction is exclusive of all state authority.*" (Emphasis added.)
See, State of Ohio v. Thomas, 1899, 173 U.S. 276, 283–284, 19 S.Ct. 453, 43 L.Ed. 699; United States v. Unzeuta, 1930, 281 U.S. 138, 142, 50 S.Ct. 284, 74 L.Ed. 761; Surplus Trading Co. v. Cook, 1930, 281 U.S. 647, 652–656; Standard Oil Co. v. California, 1934, 291 U.S. 242, 54 S. Ct. 381, 78 L.Ed. 775; Pacific Coast Dairy, Inc., v. Dept. of Agriculture, 1943, 318 U.S. 285, 294–295, 63 S.Ct. 628, 87 L.Ed. 761. Cases such as United States v. Fox, 1876, 94 U.S. 315, 320, 24 L.Ed. 192; Reading Steel-Casting Co. v. United States, 1925, 268 U.S. 186, 188, 45 S. Ct. 469, 69 L.Ed. 907; Los Angeles & Salt Lake R. Co. v. United States, 9 Cir., 1944, 140 F.2d 436, 437, certiorari denied 1944, 322 U.S. 757, 64 S.Ct. 1264, 88 L.Ed. 1586; United States v. Williams, 5 Cir., 1947, 164 F.2d 989, 991; United States v. Burnison, 1949, 339 U.S. 87, 90, 70 S.Ct. 503, 94 L.Ed. 675; United States v. Nebo Oil Co., 5 Cir., 1951, 190 F.2d 1003, 1010, referred to in the briefs, do not teach a different doctrine. They merely state the general proposition that, ordinarily, property, especially personal property, acquired by the Government, retains the characteristics which it had under State law.

**42.** Collins v. Yosemite Park & Curry Co., 1938, 304 U.S. 518, 527–530, 58 S.Ct. 1009, 82 L.Ed. 1502; Stewart & Co. v. Sadrakula, 1940, 309 U.S. 94, 99–101, 60 S.Ct. 431, 84 L.Ed. 596.

**43.** Anderson v. Chicago & N. W. Ry. Co., 1918, 102 Neb. 578, 168 N.W. 196.

under the demands of national security, the Government should tolerate interference by State water authorities, upon a showing that a portion of the land is used for agricultural purposes. Granted that it is, it is outside the purview of State regulation or control.

## VIII

### Conclusions

In what precedes, we have discussed the main legal questions involved which, in the opinion of the Court, can be determined in advance of trial.

Supplemental problems are referred to in the notes to the text. Others discussed in the briefs are not touched on at all because they should not, in the opinion of the Court, be decided until a record of all the facts is before the Court. Because the defendants have filed three separate briefs, it has not been easy to ascertain their true position as to all issues. At times, they drew different conclusions from identical principles or authorities.

 The following conclusions may, however, be stated in answer to some of the contentions made in this case:

1. In this case, the Government, by reason of its sovereign status, claims no right to the use of a greater quantity of water than it acquired when it purchased the Rancho Santa Margarita, together with any rights to the use of water which it may have gained by prescription or use, or both, since its acquisition of Rancho Santa Margarita in 1942.

2. The riparian rights of the Government acquired through the purchase of the Rancho Santa Margarita are correlative as to other riparian owners, and are to be measured according to the law of the State of California.

3. The riparian rights of the Government are paramount to those of appropriators like the two corporate defendants, in the sense in which the word "paramount" is used in the water law of the State of California.

4. The extent of the rights of the Government is to be determined on the basis of the beneficial use to which the water in the Santa Margarita River has been put by the Government or its predecessor, or may in the future be put by the Government.

5. A military use is a riparian, beneficial use under the law of the State of California.

6. Prescriptive rights to water may be acquired under California law. Neither the Water Commission Act of 1913,[44] nor the constitutional amendment of 1928,[45] have changed the law in this respect. Such prescriptive rights, being extra-legal, are not dependent for their inception upon application, or their fruition upon any administrative action by the Department of Water Resources of the State of California.[46]

7. The Department of Water Resources of California has no jurisdiction over the enclave of the United States Government in Camp Pendleton.

8. The United States Government is, however, required to respect the rights of other riparian owners or appropriators who, according to the law of California, may have acquired rights, permanent or temporary, to any surplus water in the Santa Margarita River.

9. It will be incumbent upon the Government, at the trial, to prove the beneficial use of water, and the extent of such use for present or prospective installations.

10. If the Government or its predecessor in interest have put the water of the Santa Margarita River to non-riparian use, whether by using it in another watershed or not, the Government will have the burden of proving that such

44. Cal.Stats.1913, Ch. 586; Cal.Water Code, Secs. 1000-4360.

45. Constitution of California, Art. XIV, Sec. 3.

46. See cases and authorities cited in Note 24.

use was hostile to others and has resulted in a prescriptive right.

11. Fallbrook cannot assert any prescriptive rights during the period when it received water from the Government and its predecessor in interest under the revocable permit dated July 20, 1932, which was terminated on July 31, 1948.

12. The decree of the Court shall determine the rights of the Government and the corporate defendants to the waters of the Santa Margarita River, and apportion the flow.

13. The decree shall also determine the overlying rights as to any subterranean waters, as between riparian owners and appropriators.

14. The foregoing does not exclude other inferences or collateral conclusions which may be deduced from the legal principles declared in this opinion.

15. Other deductions, dependent on proof of specific facts, even when the legal principles are not in dispute, are not to be made until after all the relevant facts have been presented, and the Court's conclusion thereon announced.